**SO ORDERED.**

**SIGNED this 30 day of November, 2011.**



```
                                   _____
                                        Stephani W. Humrickhouse
                                        United States Bankruptcy Judge
```
_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| FRANKLIN CHARLES WEFALD | 10-08068-8-SWH |
| DEBTOR | |
| ERIC JANIS, | ADVERSARY PROCEEDING NO. |
| Plaintiff, | 10-00266-8-SWH-AP |
| v. | |
| FRANKLIN CHARLES WEFALD and MILLENNIA CARDIOVASCULAR, P.A., | |
| Defendants. | |

**MEMORANDUM OPINION SETTING FORTH BASIS FOR COURT'S PRIOR RULINGS ON LIABILITY, DAMAGES, AND DISCHARGEABILITY**

This court previously entered an order granting the motion for summary judgment filed by plaintiff Eric Janis with respect to the defamation claims in his complaint against the defendant Franklin Charles Wefald, the debtor in this chapter 11 case. That order, which was entered on September 8, 2011, granted summary judgment as to liability and scheduled a hearing on damages

and dischargeability of the claims. That hearing, which took place in Raleigh, North Carolina, over two days, on September 15 and16, 2011, featured a full presentation of evidence from both sides. On November 15, 2011, the court entered an order awarding to the plaintiff actual damages in the amount of $150,000, and punitive damages in the amount of $500,000. The order provided that the claims are nondischargeable. This memorandum opinion sets out the bases for the prior rulings on liability, damages, and dischargeability.

## Jurisdiction

The bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. All parties expressly consented on the record to the entry of final judgment by this court.[1]

## Background

Dr. Franklin Charles Wefald filed a petition for relief under chapter 11 of the Bankruptcy Code on October 3, 2010. Dr. Eric Janis filed a claim in the bankruptcy case and also, on October 20, 2010, initiated an adversary proceeding against Dr. Wefald and Millennia Cardiovascular, PA, which is a business of which Dr. Wefald is an employee. The complaint sought to recover damages for defamation and a determination that Dr. Janis' claim is not dischargeable. Dr. Wefald filed an answer to Dr. Janis' complaint on December 13, 2010 (and an amended answer

---

[1] This proceeding involves state law defamation claims but operation of 11 U.S.C. § 157(b)(5) does not preclude this bankruptcy court's exercise of subject matter jurisdiction. See Stern v. Marshall, 131 S. Ct. 2594, 2606-08 (declining to determine whether defamation claims constitute personal injury torts, finding that § 157(b)(5) "is not jurisdictional," and emphasizing the significance of a litigant's consent (or failure to timely object) to a bankruptcy court's resolution of a claim for defamation).

and counterclaims on December 14, 2010), asserting that Dr. Janis made defamatory statements about him. Dr. Janis responded to the counterclaims by denying the defamatory statements and asserting the common interest privilege as an affirmative defense.

In an order dated September 8, 2011, the court granted the motion for summary judgment filed by Millennia Cardiovascular, PA, which resolved all issues as to that party. On October 7, 2011, the court entered summary judgment in favor of Dr. Janis with respect to defamation allegations asserted by Dr. Wefald in counterclaims to the complaint.[2] Because there were no material issues of genuine fact on Dr. Janis' defamation claims in his complaint against Dr. Wefald, this court entered judgment as a matter of law in favor of Dr. Janis.

During the hearing on the nature and extent of the damages to be awarded, and on whether Dr. Janis' claim should be dischargeable, the court heard a full presentation of evidence from both sides. The crux of the issue was whether Dr. Wefald acted with actual malice when he made multiple statements on a radio program (hereinafter the "radio show") to the effect that Dr. Janis had interfered with Dr. Wefald's treatment of a patient, Bennett Leggett, resulting in permanent harm to Mr. Leggett. The parties have an extensive history of personal and professional discord. In this proceeding, the court already had found Dr. Wefald liable for various instances of defamation, but the radio show emerged as the most egregious instance of defamation, and it provides most, but not all, of the basis for the court's award of punitive damages.

---

[2] There were multiple allegations of defamation by Dr. Wefald against Dr. Janis in the amended answer and counterclaims. All but one were voluntarily dismissed or abandoned by Dr. Wefald, or disposed of by an entry of judgment on the pleadings in Dr. Janis' favor. The last remaining allegation was disposed of by the entry of summary judgment in favor of Dr. Janis.

Dr. Janis argued that Dr. Wefald's statements were made with actual malice, such that an award of damages should be nondischargeable. Dr. Wefald countered that "[g]iven the totality of the circumstances, Defendant's statements may have been negligent but they were not willful and malicious." Pre-Trial Order (September 14, 2011). Both Drs. Wefald and Janis testified at the hearing and the court had ample opportunity to assess the credibility of both parties, as well as the other witnesses. On November 15, 2011, in order to facilitate without delay the parties' ability to determine whether they wished to pursue an appeal of previous related orders, the court entered an order awarding actual damages in the amount of $150,000 and punitive damages in the amount of $500,000. The court found that the claims are nondischargeable.

## Discussion

I.   Degree of Liability

The court already has entered summary judgment in favor of Dr. Janis on the issue of liability with respect to defamatory statements made by Dr. Wefald. The court concludes that the statements primarily at issue (those being Dr. Wefald's statements on the radio show) were made with full knowledge of their falsity.[3] This is relevant because intent and motives are not the measure of actual malice; knowledge is. Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 53, 108 S. Ct. 876 (1988); Varner v. Bryan, 440 S.E.2d 295, 300 (N.C. App.1994). As the plaintiff points out, the "purposeful avoidance of the truth" may itself support a finding of actual malice. Harte-Hanks

---

[3] The statements made by Dr. Wefald during the radio show covered a wide gamut of topics, but Dr. Janis' briefs focus on the statements pertaining to the care and treatment of Mr. Leggett and the court will do the same. In so doing, the court does not discount or ignore the import of the other defamatory statements of which Dr. Janis complained. It is the court's opinion that statements made during the radio show are representative of, and similar in tone to, those remarks, though publicized to a much wider audience.

4

Communications, Inc. v. Connaughton, 491 U.S. 657, 692, 109 S. Ct. 2678 (1989). In this proceeding, with respect to the radio show statements made by Dr. Wefald, the court finds that Dr. Wefald's statements were willful and malicious, such that Dr. Wefald acted with actual malice.

The statements made by Dr. Wefald on the "Heart to Heart" radio program, which was broadcast on November 29, 2009 on station WTSB out of Smithfield-Selma, North Carolina, reached a listening audience of approximately 45,000 people. The transcript of the broadcast has been introduced into evidence and there is no dispute regarding the accuracy of its contents. In that program, Dr. Wefald undertook to "reveal to the public and to reveal to my patients and the citizens of Johnston County the mess that I have been through." Transcript of Radio Program at 3 (hereinafter "Transcript"). He requested that the radio host swear him in on a Bible that he had brought with him, "as though he was being sworn in in court." Transcript at 6. Dr. Wefald informed the audience that he was "mad as hell," and then proceeded to discuss the gamut of his grievances with respect to the administration, staff, physicians and operations of Johnston Memorial Hospital and, in particular, his "rival," plaintiff Dr. Janis, in an effort to "expose them for who they are." Transcript at 6, 4.

In very general terms,[4] the events to which Dr. Wefald referred concerned Mr. Bennett Leggett's admission to Johnston Memorial Hospital on June 11, 2009. Dr. Wefald was Mr. Leggett's physician, had been his physician for approximately nine years, and admitted Mr. Leggett after having diagnosed him with pneumonia. Mr. Leggett's hospitalization ultimately

---

[4] The following recitation of the facts as presented to the court is intended specifically and only to recount the events surrounding Mr. Leggett's treatment *insofar as those events are relevant to determining the defamation issues before this court*. This court's factual findings thus are not relevant to, nor should they be relied upon in connection with, any other legal proceeding in any other court concerning the events surrounding Mr. Leggett's medical treatment.

involved a dispute between Dr. Wefald and others at Johnston Memorial Hospital over the appropriate medical care to be given to Mr. Leggett, and a statement given by Ms. Jammie Leggett on August 9, 2009, recounts a weekend of extremely stressful events.

Mr. Leggett was admitted on a Thursday evening. The next morning, a physician's assistant, Ms. Nila Thompson, and other hospital personnel urged Mrs. Leggett to remove her husband from Dr. Wefald's care and transfer him to a different doctor because, she was told, if she did not, her husband would die within 24 hours. Def.'s Ex. 2 at 1 (Statement of Jammie Leggett dated August 9, 2009). Ms. Thompson reportedly informed her that Dr. Wefald "lied" about the pneumonia diagnosis, that the problem was with Mr. Leggett's heart, and that Mr. Leggett was not receiving care he urgently needed. Ms. Thompson and others also persuaded Ms. Leggett that Dr. Wefald posed a physical threat to her and her daughter, and prevented Ms. Leggett from seeing Dr. Wefald when he came to the hospital. On Friday evening, Mr. Leggett, distressed by the contradictions and conflict, went into cardiac arrest and required the care of a "crash crew" to stabilize his condition. Id. at 1-2. On Saturday, June 13, Mr. Leggett was transferred away from Dr. Wefald's care and into the care of a Dr. Atkeson. Arrangements were made to transport him to a different hospital for a heart catheterization. Dr. Wefald came to the hospital, ultimately did meet with the Leggett family, and reassured them of the correctness of his diagnosis. The Leggett family decided to keep Dr. Wefald as Mr. Leggett's physician. It was determined that Mr. Leggett could not safely be transported for the heart procedure. Mr. Leggett underwent a bronchoscopy on Monday, June 15, and tests revealed bacteria consistent with a diagnosis of pneumonia in his lungs.

Ms. Leggett was subsequently told by a Dr. Powell that the bronchoscopy "could have been done on Saturday if all of the other events were not unfolding," and that the delay had put "extra

strain and stress" on Mr. Leggett's heart. After his hospitalization, Mr. Leggett was required to take 22 pills per day instead of the five he took before, and required a six hour IV daily to keep muscle in his heart contracting, as a result of "the damage his heart endured." Id. at 3.

In Ms. Leggett's account, which was introduced into evidence by the defendant, Dr. Janis is mentioned exactly one time: Ms. Leggett recalled that he was sitting behind the charge nurse for the ICU unit when Ms. Leggett spoke to the nurse about whether she should get a second opinion about the condition of Mr. Leggett's lungs. Id. at 1. This statement is consistent with Ms. Leggett's testimony during the hearing, in which, when asked about Dr. Janis' role in these events, she stated only that Dr. Janis was "right there." In the radio show, however, Dr. Wefald laid these events squarely at the feet of Dr. Janis, and held Dr. Janis accountable for what Dr. Wefald described as "permanent harm" to Mr. Leggett.

Dr. Wefald stated that Dr. Janis interfered with his care of "the patient" (i.e. Mr. Leggett, though he was not identified by name) by canceling a scheduled bronchoscopy, resulting in a delay of two days before the procedure took place. "Nila Thompson at the behest of Dr. Janis went to his wife and said to him that "Dr. Wefald is lying to you. You don't have pneumonia." Transcript at 21. According to Dr. Wefald, "Dr. Janis' people" lied to Ms. Leggett, telling her that " if you don't transfer him to Dr. Janis or Dr. Atkeson's service, he's going to die." Id. at 48, 21. Dr. Wefald stated that the patient was "harmed" and had "mucus plugging up his lungs that sat there for two extra days because of what they did." Id. at 49. The delays and stress, according to Dr. Wefald, "permanently injured" Mr. Leggett by resulting in his need to be "on oxygen at home," which he had not needed before. Id. at 23. Dr. Wefald stated that he wanted his patients to "feel safe" and that he wanted to ensure they were "not going to be treated like the family who was lied to by Dr.

7

Janis" and others at the hospital. Id. at 31. "This patient of mine caught in the cross fire. I mean *they were willing to harm that guy to get to me, okay*?" Id. at 42.

There is, however, absolutely *nothing* in the evidence presented to the court to support the notion that Dr. Janis had *any* active role in the events that unfolded, much less that he entered or contradicted any order given with respect to Mr. Leggett's medical care. Instead, there is ample evidence, *of which Dr. Wefald was aware*, which *disproves* the allegations he leveled against Dr. Janis during the course of the broadcast. Medical records introduced into evidence show that the order for the bronchoscopy was entered on June 15, 2011, thus post-dating the weekend events of which Dr. Wefald complained. Similarly, Dr. Wefald said on the air that interference with his patient and the purported delay in a bronchoscopy resulted in the patient being on permanent home oxygen and, in that capacity, "permanently injured." In fact, the medical records make it abundantly clear that Mr. Leggett was on oxygen prior to the events of June 12, 2009, and that oxygen was a regular component of his medical regime. As Dr. Wefald stated in the program, he knew the patient well, having treated him for nine years. Id. at 52.

The evidence shows that Dr. Wefald's radio show statements regarding Dr. Janis' involvement in the Mr. Leggett's hospitalization were false when made and that Dr. Wefald knew they were false when made. Dr. Wefald made similar statements in a letter dated November 1, 2009, which he published to the Chief Operating Officer of Johnston Memorial Hospital, two other doctors, and his lawyer.[5] Dr. Wefald's intent in making the statements about Mr. Leggett's

---

[5] In the letter, Dr. Wefald claimed that Dr. Janis' acts resulted in Mr. Leggett needing the installation of a pacemaker/defibrillator. This was untrue. As Dr. Wefald knew, based on his own examinations of Mr. Leggett and as evidenced in medical records Dr. Wefald himself prepared, Mr. Leggett already had such a device when Dr. Wefald admitted him to the hospital. Yet, Dr. Wefald wrote:

hospitalization was made clear by Dr. Wefald himself. In his deposition, when asked about what he had termed his "duty" to make statements about Dr. Janis, Dr. Wefald testified as follows:

> I think I definitely had a duty about the Leggett situation. I felt that that was morally reprehensible, what he did.
>
> And I think that I had a duty to make sure that it was known that he was willing to commit morally reprehensible acts that would potentially harm patients, because other patients may have been harmed as well in the future.
>
> And I had to make sure that my patients knew, especially, that he was willing to commit morally reprehensible . . . acts that were indefensible in terms of medical ethics, and that I was hoping that he wouldn't do that again. But if he did, that patients would be aware that he had done this before.

Wefald Depo. at 131-32.

Dr. Wefald's specific goal, then, in discussing the "Leggett situation" on the radio show, was to broadcast as widely as possible his conclusions with respect to Dr. Janis' character, ethics, and performance as a physician. Dr. Wefald's statements were utterly at odds with facts known to him. They were, in fact, made with knowledge of their falsity and with the express intent of persuading the listening audience that Dr. Janis was "willing to commit morally reprehensible . . . acts that were indefensible in terms of medical ethics." Id. This is, of course, defamation per se, and it was undertaken with actual malice.

---

> It also should be noted that we had scheduled him for bronchoscopy that day to remove several mucous plugs. The bronchoscopy was cancelled by Dr. Atkeson, Dr. Janis, and Nyla Thompson.
>
> * * *
>
> Because of the delay in his bronchoscopy Mr. Leggett is now on permanent home oxygen. In addition his ischemic cardiomyopathy became worse because of chronic hypoxemia and he had to have the implantation of a biventricular pacemaker/ defibrillator.

Plaintiff's Ex. 2 at pp. 8, 9 (Letter from Dr. Frank Wefald to Medical Staff, *et. al* (Nov. 1, 2009)).

9

In addition, Dr. Wefald erroneously stated that Dr. Janis was going to lose his medical license in several contexts: the November 1, 2009 letter he shared with colleagues, and in his comments to others at the hospital in October 2009. It appears to the court that these statements, though they are defamatory and evidence negligence or even a reckless disregard for the truth, are not marked with the actual malice that characterizes Dr. Wefald's comments about the care of Mr. Leggett.

II.    Amount of Damages

In the context of defamation per se, which "tends to impeach a person in that person's trade or profession," there is no need to prove damages because they are assumed. Javurek v. Jumper, 609 S.E.2d 498 *3 (N.C. App. 2005) (table; text in Westlaw). "The law presumes that general damages actually, proximately and necessarily result from an unauthorized publication which is libelous per se and they are not required to be proved by evidence since they arise by inference of law, and are allowed whenever the immediate tendency of the publication is to impair the plaintiff's reputation, although no actual pecuniary loss has in fact resulted." Flake v. Greensboro News Co., 195 S.E. 55, 59 (N.C. 1938) (citation omitted).

The court finds that the plaintiff incurred actual damages, though taking the measure of those damages is a difficult thing. Dr. Janis testified that his income in 2009 dropped by approximately $100,000 but that it has not otherwise appreciably changed. He testified that he incurred attorney fees, but no evidence of the extent of those fees was put before the court. He also testified that he defines himself as a physician, and that Dr. Wefald's statements caused him to alter his behavior and to stop taking part in activities and committee work related to his profession. In Dr. Janis' view, according to his testimony, his participation on, for example, the hospital's safety committee is

10

wholly dependent upon his integrity, and as a result of Dr. Wefald's spoken and written statements, he was left with unresolvable worries about what people had heard and what they had been led to believe. This, he testified, affects his ability to accomplish and achieve his professional and personal goals.

In the context of defamation per se, it is appropriate to assess damages for mental suffering and damage to reputation, and the court agrees with the plaintiff that the North Carolina Pattern Jury Instructions for defamation are helpful:

> Actual harm damages include such things as impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. You may award actual harm damages to the extent you find the plaintiff has suffered such actual injury.

The court already has awarded actual damages in the amount of $150,000, which the court believes to be fair and reasonable compensation for Dr. Janis' loss of income, impairment of reputation, and mental anguish.

In addition, the court has discretion to assess punitive damages. Those damages are not intended to compensate, but rather are fines imposed "to punish reprehensible conduct and to deter its future occurrence." Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974). In North Carolina, the court must determine whether to award punitive damages and, if so, in what amount, with reference to evidence that relates to the following factors:

      a.      The reprehensibility of the defendant's motives and conduct.
      b.      The likelihood, at the relevant time, of serious harm.
      c.      The degree of the defendant's awareness of the probable consequences of its conduct;
      d.      The duration of the defendant's conduct;
      e.      The actual damages suffered by claimant;
      f.      Any concealment by the defendant of the facts or consequences of its conduct;
      g.      The existence and frequency of any similar past conduct by the defendant;
      h.      Whether the defendant profited from the conduct;

      I.        The defendant's ability to pay punitive damages, as evidenced by its revenues or net worth.

N.C. Gen. Stat. § 1D-35.

      The plaintiff argues in his memorandum that "Dr. Wefald has demonstrated that unless this Court punishes him severely by imposing significant punitive damages, he will not be deterred; he will not be stopped. Despite repeated counseling from friends, colleagues and his own lawyer that he should end his one-man war against Dr. Janis, he persists." Plaintiff's Trial Brief on Actual Malice and Damages, at 9. The court agrees. For the reasons that follow, the court awarded punitive damages in the amount of $500,000.

      In this matter, Dr. Wefald specifically dared Dr. Janis to sue him. Dr. Wefald testified in his deposition that "it's interesting because several [patients] said, 'Wonder why [Dr. Janis] hasn't sued you for libel. Must be because all this stuff is true.'" Wefald Depo. at 122. "I think after this thing with the Leggetts, I think when people found out about it they were disappointed in his behavior. And I think perhaps that has caused both patients and physicians alike to question his character. I mean, it was pretty clear that Mr. Leggett had pneumonia. I mean, that's what got him better. And so either he was a terrible diagnostician in this case or he was lying. And neither situation is a good thing to have, so." Wefald Depo. at 129-30.

      Dr. Wefald's statements in his deposition corroborate his apparent intent in making his statements during the radio show: to portray Dr. Janis as both a liar and as having inflicted permanent harm upon a patient in circumstances that were "morally reprehensible," and to do so to the largest, most general audience possible. The deposition testimony also illustrates Dr. Wefald's steadfast intent to hold fast to his opinions, regardless of known facts that prove them wrong. The court concludes that Dr. Wefald's behavior and the motives that prompted it were reprehensible; that

12

the likelihood of causing serious harm to Dr. Janis was high, of which Dr. Wefald was not only aware, but which he in fact sought to accomplish; that Dr. Wefald caused Dr. Janis to incur at least a moderate drop in his income, and that Dr. Wefald stood to gain by persuading the public and other doctors to avoid Dr. Janis as a physician; that Dr. Wefald's current earnings, as well as his earning potential, are such that he is able to pay punitive damages; and that Dr. Wefald will, unless it is otherwise made abundantly clear, persist in his public campaign of disinformation with respect to Dr. Janis.

That said, it appears to the court that Dr. Wefald's emotionally charged rant on the radio show probably, and ironically, self-limited some of the damage that he sought to inflict. Dr. Wefald found fault, bad intent, and epic failings of one kind or another on the part of so many people that most rational listeners would take his comments with a grain of salt. An unidentified but insightful caller at the very end of the show made the following observation: "You know, as a citizen and resident of this area, I think – I am just sitting here with my jaw dropped *at the conversations that are going on about* what's going on at the hospital." Transcript at 55. Not at "what's going on at the hospital," but "*at the conversations that are going on*" about the hospital. "I think that as divorces go, this is probably one of the messiest divorces this county has ever had," the caller continued. Transcript at 55. Finally, this caller goes on to compliment the quality of the new hospital, and then concludes: "[Y]ou know, I think there's a place to air dirty laundry, and I'm not sure through this whole process if anyone is going to come out a winner." Transcript at 57.

The court agrees with the unknown caller, and also with observations made by Ms. Leggett, the widow of Mr. Leggett. Dr. Janis called Ms. Leggett as a witness at the hearing, and her testimony was very telling. The court was struck in particular by this statement, offered when

13

counsel for Dr. Wefald questioned whether Ms. Leggett's memory of events might not be as strong now as it was shortly after the distressing events of June 11-15:

> No. I've had to live this nightmare, and my husband's death, over and over because *people tend to act like children instead of adults*. I can't put my husband to rest because every time I turn around, there is an attorney calling me, wanting something else, and I really, really, really need to move on with my life. *As well as they do.* And let my husband rest.

Ms. Leggett testified that in the context of her discussions with other people involved in her husband's medical care, regarding what she perceived to be the need for the state medical board to investigate the events, she was referring to a failure on the part of the hospital team and not any particular wrongdoing as to Dr. Janis. Ms. Leggett also testified, with what the court interpreted to be exasperation, that "everything has to be made out about Dr. Janis. If you say Wake Heart, Dr. Janis. If you say Smithfield Heart, Dr. Janis. Everybody wants to throw Dr. Janis under the bus." The court understood Ms. Leggett's testimony to mean that she was tired of having her efforts to hold the *hospital* accountable (as well as her more specific grievances with physician's assistant Nila Thompson) interpreted as aligning with Dr. Wefald's effort to hold Dr. Janis responsible. And of Dr. Wefald, Ms. Leggett stated that he was "very good to us. He was an awesome doctor until he and Dr. Janis got to where they couldn't quit fighting and, you know, let's give them a pair of boxing gloves."

The court sympathizes with Ms. Leggett. It appears that both Dr. Wefald and Dr. Janis failed to seize opportunities to step up, set the tone, and exemplify professionalism in the context of their employment and care of patients. The parties' willingness to perpetually and publicly bicker, thus advertising their obvious dislike for each other, is, in the court's view, a self-inflicted blow to both their reputations. Dr. Janis was not an innocent bystander to these events, given that

14

he instigated and engaged in professional sparring with Dr. Wefald through his complaint to the medical board (which was dismissed) and his communication to the hospital administration about what he characterized as Dr. Wefald's unprofessional conduct. Dr. Janis' grievances, however, were aired *within the boundaries of professional privilege*. Dr. Wefald ignored these boundaries and took his grievances to untenable and legally improper lengths.

III.     Dischargeability

A discharge under chapter 11 will not discharge a debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). This court has found that Dr. Wefald acted with actual malice in making defamatory statements concerning Dr. Janis, in the context of the hospitalization and treatment of Mr. Bennett Leggett, as discussed above. The award of actual and punitive damages is not dischargeable.

For the foregoing reasons, Dr. Janis' motion for summary judgment previously was GRANTED as to liability, and the defendant Dr. Wefald was directed to pay to Dr. Janis the sum of $150,000 in actual damages and the sum of $500,000 in punitive damages. Both sums are nondischargeable.

**SO ORDERED.**

**END OF DOCUMENT**